# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| |
|---|
| UNITED STATES OF AMERICA |
| v. |
| MICHAEL CRAWFORD |

No. 3:13cr6(MPS)

## RULING AND ORDER ON DEFENDANT'S MOTION FOR REVOCATION
## OR AMENDMENT OF DETENTION ORDER

Defendant Michael Crawford is charged with producing, distributing, and receiving child pornography and is detained under an order of pretrial detention entered by United States Magistrate Judge William I. Garfinkel. On January 31, 2013, the Court held a hearing on Defendant's motion to revoke or amend Judge Garfinkel's detention order [doc. # 13]. For the reasons set forth below, the Defendant's motion is denied.

## I. Background

On January 8, 2013, a Grand Jury returned an indictment charging the Defendant with one count of production of child pornography, in violation of 18 U.S.C. § 2251(a), one count of distribution of child pornography in violation of 18 U.S.C. § 2252(a)(2), one count of receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2), and one count of forfeiture under 18 U.S.C. §§ 2253 and 2428. The Defendant was first arrested by state authorities in July 2012. He signed a written statement at the time of his arrest admitting that he took pictures of a three-year-old victim in his care and traded them on the Internet, and describing collections of images and videos that he had accumulated in various e-mail accounts and other locations. Later, in October 2012, federal authorities obtained and executed a warrant authorizing a search of Defendant's

e-mail account.  The fruits of that search were obtained in November 2012 and became part of the basis for the federal charges; they were not the basis for the earlier state charges.

The Defendant was arraigned on the federal charges on January 9, 2013 before Magistrate Judge Garfinkel, who issued a temporary order of detention upon motion by the Government.  The Defendant appeared before Magistrate Judge Garfinkel on January 14, 2013 for a detention hearing under 18 U.S.C. § 3142(f).   At the conclusion of the hearing, Judge Garfinkel issued a detention order, finding by clear and convincing evidence that there was no set of pretrial release conditions that would reasonably and adequately assure the safety of the community.  (*See* Detention Order Pending Trial [doc. # 12] at 2.)  On January 15, 2013, the Defendant filed the motion before this Court under 18 U.S.C. § 3145(b).

At the January 31 hearing before this Court, the parties proceeded by proffer and did not offer testimony.   *See* 18 U.S.C. § 3142(f).[1]   The Defendant first offered evidence of his compliance with the conditions of release imposed by the state court in connection with the state charges.  Specifically, the Defendant pointed out that, during the six months between his state arrest and his federal indictment, the state court had released him on conditions, including a condition of electronic monitoring and a condition that he refrain from having contact with minors, and that the state pretrial services authorities had filed reports indicating that he had complied with the conditions of his release. Second, defense counsel proffered that the

---

[1] The Defendant and his counsel specifically requested that the Court schedule the hearing on the motion for revocation or amendment approximately two weeks after the hearing before Magistrate Judge Garfinkel so that they would have sufficient time to review the transcript of the latter hearing in order to prepare for the hearing before this Court. (*See* Order [doc. # 14]; Notice [doc. # 17]; Order [doc. # 20].)  The transcript of the detention hearing was posted on the docket on January 22, 2013, and has been available to the parties.  This Court considered the transcript, among other items, in reaching its decision. *See United States v. Delker*, 757 F.2d 1390, 1395 n.3 (3d Cir. 1985).

Defendant's wife would testify that, if released, the Defendant would have absolutely no contact with the minor victim, that he never contacted the minor victim while on release on the state charges, and that he never attempted to contact the minor victim by telephone. Defense counsel also stated that the wife would testify that the poses of the minor victim that defense counsel had described to her were normal poses that the toddler would be asked to assume while being cleaned. Third, defense counsel proffered the testimony of Dr. Suzanne Sgroi, who both sides agree is a qualified psychologist with substantial experience testifying in court on issues related to child sexual abuse. Defense counsel stated that Dr. Sgroi would testify consistently with two letters that she submitted to counsel, both of which the Court has considered and which are discussed further below (the "January 7 Letter" and the "January 29 Letter," respectively).

At the hearing, the Defendant proposed that he be released to live at his parents' home in Yarmouth, Massachusetts, subject to various conditions, including electronic monitoring and a ban on access to the Internet. This was a modification from his earlier, written bond proposal, under which he would continue to live at home in Winsted, Connecticut—alone—subject to electronic monitoring and other conditions, but with Internet access. At the hearing, defense counsel stated that the Defendant's mother stayed at home during the day and would be able to monitor the Defendant's activities. Both of the Defendant's parents attended the hearing and indicated through defense counsel that they would be willing to serve as custodians for their son and would further post their own home as security to ensure his compliance with any conditions of release.

When asked by the Court about the Government's suggestion that it would consider the possibility of release to a residential treatment facility for sex offenders, defense counsel acknowledged that he had not researched this possibility. The Government reported that there

was no such facility in Connecticut, and the Court's own inquiries to Pretrial Services have confirmed that report. The Court is aware that there may be facilities in nearby states, but that these facilities have selective admissions policies and require payment of substantial sums by each inpatient. In any event, the Defendant has not shown any interest in being released to such a facility, and his counsel stated that he would not receive credit for time spent in such a facility towards any sentence of incarceration that he might receive if convicted.

The Government relied heavily at the hearing on the nature of the images and the content of the e-mails found on the Defendant's computer. The Court observed some of those images, and others were described in the Government's papers and by the Government's attorney during the hearing. The Government also relied on the Defendant's written statement at the time of his arrest.

The Court will draw on other aspects of the hearing as necessary in its discussion below.

## II. Relevant Provisions of the Bail Reform Act

The Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.*, sets the procedures for a court to order the release or detention of defendants awaiting trial. Section 3145(b) allows a person ordered detained by a magistrate judge to file "with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." In deciding such a motion, the Court must reach its own independent conclusion on the question of pretrial detention, and may not defer to the magistrate judge's findings. *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985).

Under § 3142(e)(1), a court must order the defendant detained if it finds, after conducting a hearing, "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." In determining

whether there are conditions of release that will reasonably assure the safety of others, a court must take into account four factors:

> (1) the nature and circumstances of the offense charged, including whether the offense . . . involves a minor victim . . .
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person, including—
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. . . .

18 U.S.C. § 3142(g).

Because the Defendant is charged with the production, receipt, and distribution of child pornography, "a statutory presumption in favor of detention arises that 'no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community.'" *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001) (quoting 18 U.S.C. § 3142(e)(3).). Where, as here, the presumption applies,

> a defendant bears a limited burden of production—not a burden of persuasion—to rebut that presumption by coming forward with evidence that he does not pose a danger to the community . . . . Once a defendant has met his burden of production . . . , the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court. Even in a presumption case, the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community.

*Id.* (internal citations omitted). This case does not require consideration of the alternative standard of flight risk, as the Government acknowledged at the hearing that it was not seeking detention based on a flight risk.

## III.    Discussion and Findings

While the Court has considered all of the evidence and other submitted materials,[2] and the four factors set forth in 18 U.S.C. § 3142(g), there are three items that, together with the statutory presumption, stand out in the Court's assessment of this matter, and lead it to conclude that there is no set of conditions of release that can reasonably assure the safety of the community: (1) the images of the minor victim and the Defendant's use of those images; (2) the images of young girls taken by the Defendant at the zoo and at a baseball game and his use of those images; and (3) the Defendant's keen interest in child pornography, as evidenced by his intensive trading and downloading activity of the past few years.  The Court has organized its findings around a discussion of these three items, and addresses the other evidence and the parties' arguments in the context of those items.  Finally, the Court addresses the significance of the Defendant's six months of release on the state charges at the end of this ruling.

### A.    The Images of the Minor Victim

First, the images the Defendant took of the minor victim are disturbing—especially the following three images: (1) an image showing the minor victim lying face down on the bed in her shorts, with her left hand holding her left buttock, with the Defendant's erect penis in the

---

[2] The Court considered the following in connection with its decision: (1) three categories of images, held in the custody of the Government, that were reportedly seized from the Defendant's laptop computer and/or e-mail account and that are described herein; (2) a two-page handwritten statement signed by the Defendant at the time of his arrest and containing a typed *Miranda* warning at the top of the first page; (3) information provided by Pretrial Services based on interviews with the Defendant (in the presence of counsel), his wife, and his parents; (4) a one-page memorandum from defense counsel to Pretrial Services describing the Defendant's proposed bond package; (5) both parties' briefs to Magistrate Judge Garfinkel; (6) the Defendant's pending motion and the Government's opposition, together with attached exhibits; (7) two letters from Dr. Suzanne Sgroi, a psychotherapist who met with the Defendant on eight occasions from October 2012 through early January 2013; (8) the attorney proffers and argument at the January 31, 2013 hearing; and (9) the exhibits submitted during the January 31, 2013 hearing.

foreground, (2) an image of the minor victim's vagina, with the Defendant's fingers placed on her labia, and (3) a similar image of the minor victim's vagina, with the Defendant's fingers placed on her labia. The Government alleges, and the Defendant did not dispute at the hearing or otherwise, that the Defendant made these images and traded them on the Internet for images of child pornography made by others. Indeed, the Defendant admitted in his statement that, "I have taken pictures of her [the minor victim] with my penis exposed and then traded these pictures [with] people online." (Statement of Michael Crawford at 1.)

By themselves, these images, and the attendant evidence of the Defendant's trading them for other images of child pornography, go a long way towards satisfying the Government's burden here. First, they weigh against the Defendant on three of the four statutory factors recited above. *See* 18 U.S.C. § 3142(g). That is, the images make clear that (1) the "nature and circumstances of the offense charged" are serious and "involve[] a minor victim," (2) the evidence against the Defendant is strong, and (3) the danger the Defendant poses if released is serious. *See id*. As for the fourth factor—history and characteristics of the person—this factor speaks more to flight risk than dangerousness in a case such as this one, but the Court notes that the Defendant's ties to the community and family do little, by themselves, to assure the Court that he will not again take similar images of the minor victim, with whom he lived at the time of the alleged conduct.

These images also undermine several of the Defendant's arguments. First, they cast doubt on the factual basis for the opinion set forth in Dr. Sgroi's letters that the Defendant "presents a very low risk to the community at this time." That opinion rests in part on the following characterization of the images of the minor victim, which appears in one of the letters and which apparently came from defense counsel:

It is my understanding from your description of the seven photographs cited in the federal memorandum that the above-described child was naked or partially clothed in some or all of the photographs. It is not, of course, unusual for young children or toddlers to be allowed to move about in a nude or partially clothed state inside their own homes, or for parents to photograph them in such circumstances. Mr. Crawford maintained that the child was in no way distressed or disturbed by any aspect [of] what occurred when he photographed her in this way.

(January 29 Letter, Ex. 1, at 1–2.) Dr. Sgroi has not seen the images in question, and it is hard for the Court to believe she would have written those three sentences if she had. Even if the images had not been traded over the Internet, the three images described above (which are among the seven described in the letter) are a far cry from ordinary candids snapped by loving parents of a toddler prancing around in her birthday suit. While Dr. Sgroi's opinion does not rely solely on her Polyanna-ish characterization of these disturbing images, that characterization—a serious mischaracterization, apparently through no fault of Dr. Sgroi's—saps her ultimate opinion of much of its force.

Still, defense counsel argued at the hearing that the wife's proffered testimony—that she did not during the six months of release on the state charges and will not in the future let the Defendant anywhere near the minor victim—effectively addresses any risk to the minor victim should the Defendant be released. While the Government did not offer any specific reason to doubt the wife's sincerity, it suggested that the Government and the Court should not be required to rely on family members to serve as monitors and custodians in a case involving such serious allegations. The Court agrees, but in any event, the wife's vigilance would not address the Court's second concern, which relates to the second category of images viewed by the Court.

## B. The Images of Young Girls at a Baseball Game and at the Zoo

The Government reports that it first noticed the Defendant because he was posting to a Russian website images of young girls apparently created at a baseball game and at a zoo. (*See*

Gov't's Mem. in Supp. of Pre-Trial Detention [doc. # 9] at 1.) These images, which the Court has viewed, depict young girls in summer clothing at a zoo and at a baseball game. The Defendant apparently took some images while in close proximity to his subjects, e.g., one appears to have been taken while the Defendant was standing next to a young girl at a counter. The Defendant did not dispute at the hearing that the pictures were taken and posted on-line without the girls' or their parents' knowledge or consent.  It is unclear exactly how the Defendant managed to take these pictures without detection, but his statement includes admissions that he has taken pictures of the minor victim with both a cell phone and a camera.

While none of these pictures appears, by itself, to be pornographic and while the taking of such pictures in a public place may not have been, by itself, unlawful, the Defendant's conduct is disturbing and pertinent to the inquiry before the Court.  The Defendant who took these pictures is the same individual who took pictures of the minor victim's naked genitals and his own penis and traded them on-line for other child pornography.  He is the same individual who downloaded, according to the Government, approximately 1000 images of child pornography, and received text and e-mails referring to raping and otherwise sexually abusing children.  These facts cast the images of the young girls taken at the baseball game and the zoo in a dark light.  They raise a grave concern about the Defendant's deployment of these images in his on-line trading activities, and about his everyday use of easily accessible and easily concealed devices—such as cell phone cameras—in public places.  These images and the manner in which they were captured weigh heavily against the Defendant on the fourth factor, i.e., the "nature and seriousness of the danger to any person or the community that would be posed by the person's release."  18 U.S.C. § 3142(g)(4).

Defense counsel did not have a substantive answer to the Court's concern about the zoo and baseball-game images at the hearing, and Dr. Sgroi—who has not seen these images either—makes no mention of them in either of her letters. Her opinion that the Defendant presents a "very low risk to the community" thus fails to account for his apparent skill at transforming pictures of children taken in public places into currency in the market for child pornography.

In light of this evidence, particularly the evidence suggesting the Defendant was able to capture images of young girls from up close without being detected, it is difficult to conceive of a set of conditions that could be effectively monitored that would "reasonably assure . . . the safety of the community"—short of the intensive supervision the Defendant might receive in a residential facility. If the Defendant were living alone at home as he proposed in the only written bail package he submitted to the Court, there is no condition the Court could impose that would reasonably assure that he would not use a cell phone or camera to take pictures of children who live or play in the neighborhood; he could do so even if he were confined to his home and subject to electronic monitoring. As for his proposal that he live with his parents, the Court is not prepared to rely on his parents to detect such easily concealed conduct.

### C.     The Defendant's Interest in Child Pornography

In his statement, the Defendant admits that he has been "hooked" on using pictures of the minor victim to trade for "other pictures" for approximately two to three years. (Statement of Michael Crawford at 2.) According to the Government, a search warrant of the Defendant's e-mail account yielded approximately 1000 images and 24 videos of child pornography. The Government's summary of this material is chilling, and describes images and text of children being raped, sodomized, and otherwise abused—physically and sexually. The Court has not observed most of this material, and has not counted the number of images or videos involved, but

the small amount of this material the Court has viewed falls within the description in the preceding sentence.  The Court also notes that the Defendant admits in his statement that: (1) "I use the Gladdad81 account to trade pictures and videos of children from ages 6 months old to 16 years old engaged in sexual acts as well as being undressed (nudity) pictures.  I define Softcore as nudity, while Hardcore is sexual acts."; (2) "I have [approximately] 10-20 pictures/videos currently on my Harddrive/laptop."; (3) "I have received and sent videos as well as still pictures.  I believe I have a lot of these videos and images stored in my Yahoo! email acc[oun]t online and in my Imasrc account online." (*Id.* at 1–2.) Whether the Defendant's collection of child pornography includes 1000 images or some smaller amount, his own admissions show that he has been very busy trading and downloading child pornography since becoming "hooked" over the past two to three years.  It is hard to imagine that the Defendant could have assembled such a collection in so many different locations without being a frequent online trader; it is equally hard to imagine that he could easily drop such an activity on which he has become so "hooked."

The Defendant does not really dispute that such trading presents a danger to the community.  In particular, it endangers children by stimulating demand for a product the making of which entails their abuse.  The Court need look no further than the Defendant's e-mails to find evidence of this process at work.  The Government's brief includes a description of the following December 25, 2011 e-mail sent by the Defendant:  "hi I have a young [minor victim] I would like you to send me more pics of your niece how old?" (Gov't Opp'n [doc. # 22] at 9.) As the Government argued at the hearing, an invitation like this easily could have led the Defendant's trading partner to create new child pornography of his "niece."

The letters from Dr. Sgroi do not indicate whether she was shown the descriptions of the Defendant's e-mails set forth in the Government's January 25 brief, although there was some

description of the same material in an earlier brief by the Government that Dr. Sgroi did review, according to her January 29 letter. Dr. Sgroi's January 29 letter, however, takes issue with the very notion that sex offenders in general are likely to re-offend, and though she was apparently made aware of the volume of child pornography found on the Defendant's computer, she still considers him to be a "very low risk" to the community. The bulk of her analysis on this point, though, amounts to a disagreement with Congress, which has created a rebuttable presumption that those charged with child pornography offenses are so dangerous that there is not set of conditions under which they can be released without endangering the community. *See* 18 U.S.C. § 3142(e). Thus, her January 29 letter states that "[t]here are many studies that refute the presumption of a high relapse rate for individuals who are arrested for sexual offenses," and that "study after study has demonstrated that individuals who are convicted of sexual crimes against children have a lower, not higher, relapse rate than other types of violent offenders." (January 29 Letter, Ex. 1, at 2.) These assertions, she suggests, refute a statement from the legislative history surrounding the adoption of the statutory presumption and quoted by the Government to the effect that, "sex offenders and child molesters are four times more likely than any other violent criminal to repeat their offenses against children." (*Id.*) This Court need not resolve this debate, as it is plainly bound by the presumption adopted by Congress. And apart from her contribution to this debate, Dr. Sgroi's letter sets forth little analysis as to why she believes that the Defendant presents a low risk of re-offending, or how the Defendant's circumstances might compare to those of the subjects of the studies she mentions.

Ultimately, Dr. Sgroi's conclusion that the Defendant presents a "very low risk to the community" rests on her impressions—developed during eight sessions with him over a three-month period following his arrest—that the Defendant "has presented as thoughtful, serious and

fully willing to take responsibility for his actions," and "has said repeatedly that his primary concern is to try to facilitate whatever is best for [the minor victim]"; that his "behavior in our treatment relationship has been very responsible"; and that "he has been honest and straightforward in his interactions with me." (January 7 Letter at 1.) While the Court takes seriously Dr. Sgroi's conclusions as an experienced clinician with unchallenged qualifications and an extensive background in the field of child sexual abuse, her impressions about the Defendant's interactions with her are of little value in assessing whether he will pose a threat to children—be it the minor victim, children in the neighborhood, or children accessible to his trading partners online—if he is released pending trial. The Court also notes that some of her impressions, including the suggestion that the Defendant is "thoughtful, serious and fully willing to take responsibility for his actions," are difficult to square with the Defendant's own words. In his signed statement, the Defendant admits that he has been "hooked" on trading child pornography: "I think it is from the thrill of it, the excitement, or the rush of doing something that may be 'tabeau.' [sic]. I get a rush like when I used to egg a house before Halloween. I knew it was wrong, but the excitement kept me doing it." (Statement of Michael Crawford at 2.) These words show little appreciation for the serious harm to children caused by the Defendant's activities, and do not strike the Court as the words of a man who is "thoughtful, serious and fully willing to take responsibility for his actions."

> ### D. The State Court Release Period

At the hearing, the Defendant relied heavily on the fact that the state court released the Defendant, with conditions, following his arrest in July 2012, and that the state pretrial services authorities filed monthly reports indicating that the Defendant was complying with his conditions of release, which included electronic monitoring with a 24-hour lockdown and a ban on contact

with minors.[3]  Due to the timing of the execution of the federal search warrant, however, the state court was unaware of most of the evidence against the Defendant.  More specifically, the state court could not have known of the contents of the Defendant's e-mail account—including what the Government estimates to be approximately 1000 images of child pornography—before November 2012.  Further, the Government's attorney reported at the hearing that the Government did not subsequently inform the state authorities of the results of the federal search because the Government was unaware the Defendant had been released pending trial until immediately before he was arraigned on the federal charges in January 2013.  Indeed, it is unclear whether the state court had an opportunity to observe any of the images viewed by this Court, although it would not change this Court's decision even had the state court judge seen all the same images.

More importantly, the Defendant's record of apparent compliance with his pretrial conditions of release in state court does not tell this Court very much.  From all that appears in the materials submitted to the Court, pretrial supervision in the State Court was not intensive—at least considering the nature and seriousness of the Defendant's conduct.  The evidence of the Defendant's compliance consists of six monthly reports by the state pretrial services authorities stating that the Defendant was in compliance (*see* Pre-Trial Supervision Progress Reports, Ex. 2); there is nothing to suggest that the Defendant's daily activities—aside from his physical location—were monitored, or that his access to computers, cameras, or cell phones was restricted.  Even if the Defendant had no contact with the minor victim during the period of his pretrial release on the state charges, we do not know whether he was trading her previously

---

[3] By October 31, 2012, the 24-hour lockdown was eased to allow the Defendant to search for employment in the morning. (*See* Pre-Trial Supervision Progress Reports, Ex. 2, at 3.)

downloaded pictures on-line during this period or whether, when leaving his home to look for employment or to visit his therapist, he was taking surreptitious images of young girls in the community of the type he allegedly posted to the Russian website. Especially given Congress' decision to attach what amounts to a presumption of recidivism to the type of conduct alleged in the Indictment and the Defendant's apparent success in taking images of young girls without detection, the monthly reports of the Defendant's compliance with the state court conditions of release do not provide a basis to conclude that those conditions or any other conditions of release proposed by the Defendant will reasonably assure the safety of the community.

**IV.    Conclusion**

The Defendant's Motion for Revocation or Amendment of Detention Order [doc. # 13] is DENIED. The Court adopts and continues the directions regarding detention set forth in Magistrate Judge Garfinkel's Detention Order Pending Trial [doc. # 12].


IT IS SO ORDERED.


    /s/
Michael P. Shea, U.S.D.J.



Dated:        Hartford, Connecticut
              February 5th, 2013